**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
HOUSTON DIVISION**

| | | |
|---|---|---|
| STEVEN HOTZE, et. al., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-cv-02918 |
| | § | |
| GREG ABBOTT, et. al., | § | |
| *Defendants*. | § | |

---

**DEFENDANT GOVERNOR ABBOTT'S MOTION TO DISMISS
PURSUANT TO FEDERAL RULES 12(b)(1) AND 12(b)(6)**

---

TO THE HONORABLE VANESSA D. GILMORE:

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

In the midst of an ongoing global pandemic that has taken the lives of more than 250,000 Americans and infected millions more, Plaintiffs seek to challenge the constitutionality of several of the Governor's long-since-superseded executive orders and to enjoin the implementation of a contract meant to respond to that pandemic—a contract to which the Governor is not a signatory. Plaintiffs claim the risks of COVID-19 are "trivial" and argue that the State should not be engaged in some of the alleged "surveillance" measures under the contract. Yet Plaintiffs have served only the Governor—who is plainly not a proper defendant for their claims—and, in any event, the claims lack any legal or factual basis.

Significantly, this is not Plaintiffs' first attempt to halt the implementation of this contract and to challenge the Governor's executive orders. Plaintiffs filed a nearly identical lawsuit in June 2020, and when Judge Lynn Hughes stated his intent to dismiss the lawsuit, he instructed

Plaintiffs' counsel not to refile the lawsuit unless counsel limited the number of plaintiffs from 1,300 individuals to only those he had actually spoken with. Ex. D, 21:11–22:3. Plaintiffs' counsel quickly dismissed the case. Ex. E.

But within weeks after dismissing that original case, the *same* Plaintiffs' counsel and largely the *same* group of over 1,300 Plaintiffs filed this nearly identical suit—first in the Eastern District of Texas, before it was *sua sponte* transferred to this Court—with the *same* inadequate theories and facts to support their claims. Ex. F; *see also* ECF No. 1. This attempt to forum-shop meritless claims should not go unnoticed, but this Court need not reach that issue because it can easily dispose of Plaintiffs' claims against the Governor on one of several straightforward bases.

First, this Court should dismiss Plaintiffs' claims for lack of jurisdiction because they cannot demonstrate standing to sue the Governor. Second, the Governor is also entitled to sovereign immunity because he is not the proper enforcement authority and Plaintiffs have not pleaded an ongoing violation of federal law that can be remedied through a prospective injunction. Third, even if Plaintiffs could overcome these jurisdictional hurdles (which they cannot), this Court should dismiss Plaintiffs' claims because they have not asserted viable constitutional challenges against the Governor's executive orders or the contract at issue.

For all these reasons, the Court lacks jurisdiction and should dismiss Plaintiffs' Complaint; and alternatively, this Court should dismiss the case for failure to state a claim for relief.

## II.   TABLE OF CONTENTS

I.    Introduction and Summary of Argument ........................................................................ 1

II.   Table of Contents............................................................................................................ 2

III.  Table of Authorities ....................................................................................................... 4

IV. Factual Background ................................................................................................. 9

   A.   Statutory Background ........................................................................................ 9

      1.   The Texas Disaster Act .............................................................................. 9

      2.   The Communicable Diseases Prevention and Control Act ..................... 10

   B.   COVID-19, the Governor's Executive Orders, and Contact Tracing ........................ 11

   C.   Procedural Posture ........................................................................................ 14

V.   Statement of the Issues ...................................................................................... 15

VI.  Motion to Dismiss for Lack of Subject Matter Jurisdiction ................................. 15

   A.   Federal Rule of Civil Procedure 12(b)(1) ...................................................... 15

   B.   Plaintiffs lack standing to sue the Governor ................................................. 16

      1.   Plaintiffs' alleged harm does not establish an injury-in-fact. ................. 16

      2.   Plaintiffs cannot meet the traceability and redressability requirements for standing because the Governor does not enforce the challenged executive orders and the contact tracing protocols. ................................................................... 18

      3.   Plaintiffs also lack standing to bring their challenges to the Governor's executive orders because the challenged orders were already superseded. ...................... 20

   C.   Sovereign immunity bars Plaintiffs' claims against the Governor in their entirety. ............................................................................................................ 22

VII. Motion to Dismiss for Failure to State a Claim ................................................. 24

   A.   Federal Rule of Civil Procedure 12(b)(6) ...................................................... 24

   B.   Plaintiffs' equal protection claim fails. ......................................................... 25

   C.   Plaintiffs' First Amendment freedom of association claim fails. ................... 28

   D.   Plaintiffs' due process claim fails. ................................................................. 31

   E.   Plaintiffs' Fourth Amendment claim fails. .................................................... 32

VIII.Conclusion ......................................................................................................... 35

## III.   TABLE OF AUTHORITIES

<u>CASES</u>

*6th Street Bus. Partners LLC v. Abbott*,
  2020 WL 4274589 (W.D. Tex. July 24, 2020) ............................................. 18, 19, 23

*Alden v. Maine*,
  527 U.S. 706, 713 (1999) .................................................................................... 22

*Amato v. Elicker*,
  No. 3:20-CV-464 (MPS), 2020 WL 2542788 (D. Conn. May 19, 2020) ................. 28

*Armstrong v. Turner Indus., Inc.*,
  141 F.3d 554, 563 (5th Cir. 1998) ......................................................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662, 678 (2009) ...................................................................................... 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 570 (2007) ...................................................................................... 25

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
  239 U.S. 441, 445 (1915) ...................................................................................... 32

*California v. Ciraolo*,
  476 U.S. 207, 213 (1986) ...................................................................................... 34

*Cameron v. Beshear*,
  2020 WL 2573463, at *2–3 (E.D. Ky. May 21, 2020) .......................................... 21

*Cinel v. Connick*,
  15 F.3d 1338, 1343 (5th Cir. 1994) ....................................................................... 25

*City of Austin v. Paxton*,
  943 F.3d 993, 998 (5th Cir. 2019) ......................................................................... 23

*City of Dallas v. Stanglin*,
  490 U.S. 19, 23–24 (1989) .............................................................................. 29, 30

*City of Los Angeles v. Lyons*,
  461 U.S. 95, 102 (1983) ........................................................................................ 18

*Clyce v. Farley*,
  No. 18-11189, 2020 WL 6736226 (5th Cir. Nov. 16, 2020) .................................. 14

*Collins v. City of Harker Heights*,
  503 U.S. 115, 125 (1992) ...................................................................................... 31

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496, 499 (5th Cir. 2000) .................................................................... 13, 25

*Coury v. Prot*,
 85 F.3d 244, 248 (5th Cir. 1996) ................................................................. 16

*Dorsey v. Portfolio Equities, Inc.*,
 540 F.3d 333, 338 (5th Cir. 2008) ............................................................... 25

*Ex parte Young*,
 209 U.S. 123 (1983) .................................................................................... 22

*FCC v. Beach Commc'ns, Inc.*,
 508 U.S. 307, 313 (1993) ............................................................................ 26

*Friends of Danny DeVito v. Wolf*,
 227 A.3d 872 (Pa. 2020) ............................................................................ 28

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*,
 528 U.S. 167, 180–81 (2000) ...................................................................... 16

*Glass v. Paxton*,
 900 F.3d 233, 245 (5th Cir. 2018) ............................................................... 26

*Green v. Mansour*,
 474 U.S. 64, 68 (1985) ............................................................................... 24

*Hafer v. Melo*,
 502 U.S. 21, 25 (1991) ............................................................................... 22

*Harris v. Hahn*,
 827 F.3d 359, 369 (5th Cir. 2016) ............................................................... 26

*Henry v. DeSantis*,
 No. 20-CV-80729, 2020 WL 2479447 (S.D. Fla. May 14, 2020) ........................... 28

*Home Builders Ass'n of Miss, Inc. v. City of Madison*,
 143 F.3d 1006, 1010 (5th Cir. 1998) ............................................................ 16

*In re Abbott*,
 601 S.W.3d. 802, 812 (Tex. 2020) ............................................................... 19

*In re Abbott*,
 956 F.3d 696, 709 (5th Cir. 2020) ..................................................... 19, 23, 27

*In re Gee*,
 941 F.3d 153, 160 (5th Cir. 2019) ............................................................... 17

*In re Katrina Canal Breaches Litig.*,
 495 F.3d 191, 205 (5th Cir. 2007) ......................................................... 13, 25

*Jacobson v. Massachusetts*,
 197 U.S. 11, 27 (1905) ............................................................................ 9, 26

*K.P. v. LeBlanc*,
 729 F.3d 427, 439 (5th Cir. 2013) ............................................................... 22

*Krach v. Holcomb*,
   2020 WL 2197855, at *2 (N.D. Ind. May 6, 2020) ................................................. 21

*Laird v. Tatum*,
   408 U.S. 1, 11 (1972) .............................................................................................. 31

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
   814 F. App'x 125, 129 (6th Cir. 2020) ............................................................ 27, 28

*Legacy Cmty. Health Servs., Inc. v. Smith*,
   881 F.3d 358, 366 (5th Cir. 2018) ......................................................................... 17

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................... 17

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555, 561 (1992) ................................................................................. 16, 17

*Mahone v. Addicks Util. Dist. of Harris Cty.*,
   836 F.2d 921, 934 (5th Cir. 1988) ......................................................................... 26

*Malagon de Fuentes v. Gonazalez*,
   462 F.3d 498, 504 (5th Cir. 2006) ......................................................................... 26

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*,
   369 F.3d 464, 467 (5th Cir. 2004) ......................................................................... 25

*Martinko v. Whitmer*,
   465 F. Supp. 3d 774, 777 (E.D. Mich. June 5, 2020) ............................................ 21

*McCarthy v. Cuomo*,
   No. 20-CV-2124 (ARR), 2020 WL 3286530 (E.D.N.Y. June 18, 2020) ................ 28

*Mi Familia Vota v. Abbott*,
   No. 20-50793, 2020 WL 6058290 (5th Cir. Oct. 14, 2020) .................................... 19

*Ministries v. Newsom*,
   465 F. Supp. 3d 1068, 1072 (S.D. Cal. June 4, 2020) ........................................... 21

*Minn. State Bd. for Cmty. Coll. v. Knight*,
   465 U.S. 271, 283 (1984) ........................................................................................ 32

*Minnesota v. Carter*,
   525 U.S. 83 (1998) ................................................................................................. 33

*Morris v. Livingston*
   739 F.3d 740, 746 (5th Cir. 2014) ......................................................................... 23

*Nolan v. Ramsey*,
   597 F.2d 577 (5th Cir. 1979) ................................................................................. 32

*Norris v. Hearst Trust*,
   500 F.3d 454, 461 n.9 (5th Cir. 2007) ............................................................ 14, 25

*Okpalobi v. Foster*,
    244 F.3d 405, 426 (5th Cir. 2001) ...................................................................18, 23

*Pluet v. Frasier*,
    355 F.3d 381, 385–86 (5th Cir. 2004)..............................................................21

*Port Auth. Trans-Hudson Corp. v. Feeney*,
    495 U.S. 299, 304 (1990) ...................................................................................22

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139, 146 (1993) ...................................................................................24

*Ramming v. United States*,
    281 F.3d 158, 161 (5th Cir. 2001) ....................................................................16

*Roberts v. United States Jaycees*,
    468 U.S. 609, 617–18 (1984)..............................................................................29

*Robinson v. TCI/US West Commc'ns Inc.*,
    117 F.3d 900, 904 (5th Cir. 1997)....................................................................16

*SH3 Health Consulting, LLC v. Page*,
    No. 4:20-CV-00605 SRC, 2020 WL 2308444 (E.D. Mo. May 8, 2020) .................28

*Smith v. Maryland*,
    442 U.S. 735, 740 (1979) ...............................................................................33, 34

*Spell v. Edwards*,
    962 F.3d 175, 179 (5th Cir. 2020) ....................................................................21

*Stringer v. Whitley*,
    942 F.3d 715, 720 (5th Cir. 2019) ...............................................................18, 21

*Talleywhacker, Inc. v. Cooper*,
    No. 5:20-CV-218-FL, 2020 WL 3051207 (E.D.N.C. June 8, 2020) ......................28

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389, 400 (5th Cir. 2020) ....................................................................18

*Tigges v. Northam*,
    No. 3:20-CV-410, 2020 WL 4197610 (E.D. Va. July 21, 2020) ..........................28

*Vance v. Bradley*,
    440 U.S. 93, 108 (1979) .....................................................................................26

*Village of Orland Park v. Pritzker*,
    No. 20-CV-03528, 2020 WL 4430577 (N.D. Ill. Aug. 1, 2020) ..........................28

*Washington v. Glucksberg*,
    521 U.S. 702, 719–20 (1997) .............................................................................32

*Xponential Fitness v. Arizona*,
    No. CV-20-01310-PHX-DJH, 2020 WL 3971908 (D. Ariz. July 14, 2020)............28

## STATUTES

25 Tex. Admin. Code § 97.8 ...........................................................................11

Tex. Gov't Code § 418.015(c) .........................................................................9

Tex. Gov't Code § 418.011(1) .........................................................................9

Tex. Gov't Code § 418.012......................................................................10, 19

Tex. Gov't Code § 418.014(a) ........................................................................10

Tex. Gov't Code § 418.014(b)(1) ...................................................................10

Tex. Gov't Code § 418.014(c) ........................................................................10

Tex. Gov't Code § 418.016(a) ........................................................................10

Tex. Gov't Code §§ 418.012–.025..................................................................10

Tex. Gov't Code 418.004(1) .......................................................................9, 10

Tex. Health & Safety Code § 81.005 .............................................................11

Tex. Health & Safety Code § 81.006..............................................................11

Tex. Health & Safety Code § 81.021 ........................................................10, 11

Tex. Health & Safety Code § 81.061(a), (c) ..................................................11

Tex. Health & Safety Code § 81.061(b)..........................................................11

## OTHER AUTHORITIES

Amy Lauren Fairchild et al., *Contact Tracing's Long, Turbulent History Holds Lessons for COVID-19*, OHIO STATE NEWS (dated July 20, 2020) ............................................ 13

*Case Investigation and Contact Tracing: Part of a Multipronged Approach to Fight the COVID-19 Pandemic*, Centers for Disease Control and Prevention (updated Apr. 29, 2020).................................................................................................................... 13

Commissioner Young's March 19, 2020 public health disaster declaration ................................. 12

*Coronavirus Executive Orders, Funding and Waivers*, Office of the Texas Governor..........................11

*COVID-19: Contact Tracing FAQs*, TEXAS HEALTH AND HUMAN SERVICES: TEXAS DEPARTMENT OF STATE HEALTH SERVICES ........................................................ 14

David Lakey, M.D., *Texas Health System Well Prepared to Deal with Ebola Threat*, Op-Ed, DSHS (dated Oct. 4, 2014) ................................................................................ 13

Deborah Barkin Fromer, *Contact Tracing and Tracking the Source of Diseases*, EDM DIGEST (dated Apr. 29, 2020) .......................................................................... 13

Executive Order GA-28 ......................................................................................... 12

Executive Order GA-32........................................................................................... 12

Howard E. Smith, MD., *History of Public Health in Texas*, Texas Department of Health, 1974.................................................................................................................................... 13

Sean Bland, *Reflections on the History of Contact Tracing*, O'NEILL INSTITUTE FOR NATIONAL & GLOBAL HEALTH LAW (dated July 13, 2020) ................................................. 12, 13

## RULES

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 16

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 24

Fed. R. Civ. P. 4(m) ............................................................................................................ 15

Fed. R. Evid. 201(b) ............................................................................................................ 14

## IV.   FACTUAL BACKGROUND

### A.   Statutory Background

For over a century, the U.S. Supreme Court has recognized that the authority to respond to public health crises must be "lodged somewhere," and it is "not an unusual, nor an unreasonable or arbitrary, requirement," to vest it in officials "appointed, presumably, because of their fitness to determine such questions." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). Texas's Legislature has chosen to lodge that authority in the Executive Branch pursuant to a number of statutes, two of which are relevant here: the Texas Disaster Act of 1975 ("TDA") and the Communicable Diseases Prevention and Control Act ("CDPCA").

### 1.   The Texas Disaster Act

Almost 50 years ago, the Texas Legislature passed the TDA, making the Governor the "commander in chief" of the State's response to an emergency. Tex. Gov't Code § 418.015(c). The Legislature made the Governor responsible for protecting Texas and its citizens in responding to disasters—not only the current pandemic, but also hurricanes, tornadoes, wildfires, landslides, oil spills, droughts, acts of terrorism, and so on. *Id.* §§ 418.011(1); 418.004(1). The TDA also

expressly grants the Governor the broad powers necessary to fulfill that responsibility. *Id.* §§ 418.012–.025.

The Governor may declare a disaster if he or she "finds a disaster has occurred or that the occurrence or threat of disaster is imminent." *Id.* § 418.014(a). The Legislature explicitly provided that an "epidemic" can constitute a disaster under the TDA. *Id.* § 418.004(1). While the Legislature authorized the Governor to decide when "the threat or danger has passed" or "the disaster has been dealt with to the extent that emergency conditions no longer exist," *Id.* § 418.014(b)(1), the TDA also requires the Governor to reexamine his decision every 30 days and provides that the Legislature by law may terminate it at any time. *Id.* § 418.014(c).

Under the TDA, a declaration of disaster permits the Governor to exercise a variety of emergency-management powers, including the authority to issue "executive orders, proclamations, and regulations [that] have the force and effect of law," *id.* § 418.012, and to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business . . . if strict compliance . . . would in any way prevent, hinder, or delay necessary action in coping with a disaster," *id.* § 418.016(a).

### 2. The Communicable Diseases Prevention and Control Act

In addition to the TDA, the CDPCA (currently codified in chapter 81 of the Texas Health and Safety Code) charges the Department of State Health Services ("DSHS") with "protecting the public health to prevent the introduction of disease into the state." Tex. Health & Safety Code § 81.021. The CDPCA requires DSHS to "investigate the causes and effects of communicable disease and methods of prevention," imbuing it authority to "investigate the existence of communicable disease in the state to determine the nature and extent of the disease and potential

effect on the health of individuals and to formulate and evaluate the control measures used to protect the public health." *Id.* § 81.061(a), (c).

During investigations conducted under the CDPCA, persons must provide records and other information to DSHS on request according to DSHS's written instructions. *Id.* § 81.061(c). Investigations include verifying the diagnosis, ascertaining the source of the causative agent, disclosing unreported cases, and finding contacts. 25 Tex. Admin. Code § 97.8. In the case of epidemic diseases, DSHS also has the authority to require special investigations of specified cases of disease to evaluate the disease's status in the state, and health authorities shall provide information on request. Tex. Health & Safety Code § 81.061(b).

Like the TDA, the CDPCA provides DSHS with the statutory authority needed to carry out its mandate to protect Texans from dangerous disease, *id.* § 81.021, including the authority to enter into contracts as necessary, *id.* § 81.005, and to "seek, receive, and spend appropriations, grants, fees, or donations for the purpose of identifying, reporting, preventing, or controlling communicable diseases or conditions determined to be injurious or to be a threat to the public health subject to any limitations or conditions prescribed by the legislature," *id.* § 81.006.

**B.     COVID-19, the Governor's Executive Orders, and Contact Tracing**

The COVID-19 pandemic reached American shores in early 2020 and Texas in March. On March 13, 2020, the Governor proclaimed a state of disaster, which triggered his TDA-granted powers. ECF No. 1 at ¶1379. Since then, the Governor has issued a series of executive orders that have imposed proportional and flexible restrictions to counter the spread of COVID-19.[1]  These

---

[1] *Coronavirus Executive Orders, Funding and Waivers*, *Office of the Texas Governor*, available for download at https://gov.texas.gov/coronavirus-executive-orders.

restrictions have included, among other things, occupancy limits on certain businesses and public places. GA-32, issued on October 7, 2020, is the latest such executive order currently in effect,[2] but this lawsuit does not challenge any aspect of GA-32. Plaintiffs characterize GA-26 as "the latest" executive order about which they complain, but that order was superseded on June 26, 2020—roughly a month and a half before Plaintiffs filed this suit.[3]

On March 19, 2020, the Commissioner of DSHS issued a declaration of a public health disaster for the entire state of Texas, certifying that "the introduction and spread of the communicable disease knowns as COVID-19 in the State of Texas has created an immediate threat, poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas."[4]

As part of DSHS's comprehensive approach to addressing the once-in-a-century pandemic of COVID-19, DSHS concluded that it was necessary to expand existing efforts to collect data regarding the virus's presence and spread. To that end, DSHS instituted a voluntary contact tracing program to offer additional resources for the entire State of Texas. Contact tracing is a "core disease control measure" that has been "employed by local and state health department personnel for decades."[5] This practice dates back before the 20th century and is a "staple of

---

[2] https://tinyurl.com/EO-GA-32 (Executive Order GA-32).

[3] https://tinyurl.com/EO-GA-28, p. 4 (Executive Order GA-28).

[4] https://tinyurl.com/DSHSDisasterDec (Commissioner Young's March 19, 2020 public health disaster declaration). The declaration has been renewed several times, most recently on October 16, 2020, and remains in effect. *See* https://tinyurl.com/DSHSDisasterRenewal (Commissioner Young's October 16, 2020 disaster renewal).

[5] Sean Bland, *Reflections on the History of Contact Tracing*, O'NEILL INSTITUTE FOR NATIONAL & GLOBAL HEALTH LAW (dated July 13, 2020), https://tinyurl.com/BlandReflections.

infectious disease control."[6] Indeed, contact tracing has been an integral part of DSHS's investigations authorized by the CDPCA to control the spread of communicable diseases since at least 1939, and it has been instrumental in controlling diseases such as smallpox, syphilis, tuberculosis, HIV, H1N1, and Ebola.[7]

The Centers for Disease Control and Prevention (CDC) repeatedly has warned that contact tracing is necessary to control the spread of COVID-19:[8]

- *"[Contact tracing] is a key strategy for preventing further spread of COVID-19."*
- *"Communities must scale up and train a large [contact tracing] workforce."*
- *"Immediate action is needed."*
- ***"The time to start building the trained workforce is now."***

These warnings also underscore that throughout this pandemic, time has been of the essence.

As in past outbreaks, DSHS has reacted swiftly in a variety of ways to control the spread of this dangerous disease. As relevant here, DSHS (not the Governor) entered into a contract to help facilitate a statewide COVID-19 contact tracing program.[9] DSHS's COVID-19 contact tracing

---

[6] Amy Lauren Fairchild et al., *Contact Tracing's Long, Turbulent History Holds Lessons for COVID-19*, OHIO STATE NEWS (dated July 20, 2020), https://tinyurl.com/FairchildLessons.

[7] Howard E. Smith, MD., *History of Public Health in Texas*, Texas Department of Health, 1974, p. 14 (discussing creation of Division of Epidemiology and institution of prevention measures and control of contagious diseases); David Lakey, M.D., *Texas Health System Well Prepared to Deal with Ebola Threat*, Op-Ed, DSHS (dated Oct. 4, 2014), https://tinyurl.com/LakeyEbola; Bland, *supra* at 12 n.5; Deborah Barkin Fromer, *Contact Tracing and Tracking the Source of Diseases*, EDM DIGEST (dated Apr. 29, 2020), https://tinyurl.com/FromerEDMDigest.

[8] *Case Investigation and Contact Tracing: Part of a Multipronged Approach to Fight the COVID-19 Pandemic*, Centers for Disease Control and Prevention (updated Apr. 29, 2020), https://tinyurl.com/CDCContactTracing.

[9] https://tinyurl.com/MTXContract (the MTX Contract itself). Under the applicable standards of review for both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), this Court may consider the contract because it is "referred to in the plaintiff[s'] complaint and [is] central to [their] claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000); *see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("[B]ecause the defendants attached the contracts to their motions to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of

process is relatively simple and "completely voluntary;" under the process challenged in Plaintiffs' lawsuit, no government official can "require you to participate in the process if you do not want to."[10]

## C.    Procedural Posture

On June 15, 2020, Plaintiffs' counsel, on behalf of some 1,300 individuals, filed suit in the Southern District of Texas (the "First Federal Action"), asserting COVID-19-related challenges nearly identical to the claims alleged here. Ex. A.[11] Plaintiffs' pleading suffered from the same jurisdictional defects that plague their lawsuit here, including that it lacked specific allegations concerning practically all the named plaintiffs in that suit. *Id.*

The First Federal Action lay dormant until Plaintiffs amended it to add a challenge to the Houston Mayor's decision to close the George R. Brown Convention Center, which allegedly disrupted the 2020 Texas Republican Convention. Ex. B. Because the original parties lacked a connection to that newly-added claim, Plaintiffs further amended their pleading to add the Republican Party of Texas as a party. Ex. C.

On July 22, 2020, Judge Hughes noted his intent to dismiss the lawsuit without prejudice but cautioned that if Plaintiffs' counsel were to refile, he must limit the number of plaintiffs to "ten

---

the contracts in assessing the motions to dismiss.").

[10] *COVID-19: Contact Tracing FAQs*, TEXAS HEALTH AND HUMAN SERVICES: TEXAS DEPARTMENT OF STATE HEALTH SERVICES, available for download via the "Frequently Asked Questions (FAQs)," https://www.dshs.state.tx.us/coronavirus/tracing.aspx (emphasis omitted).

[11] All court filings from the First Federal Action are subject to judicial notice. *See* Fed. R. Evid. 201(b); *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."); *Clyce v. Farley*, No. 18-11189, 2020 WL 6736226, at *3 (5th Cir. Nov. 16, 2020) (holding that the trial court was entitled to take judicial notice of the plaintiff's prior lawsuit because it was a matter of public record and considering the filings therefrom did *not* convert the 12(b)(6) motion into a motion for summary judgment), https://tinyurl.com/Clyce-v-Farley.

or fewer Plaintiffs with whom [counsel] ha[s] actually spoken." Ex. D, 21:11–22:3. Within 24 hours, Plaintiffs' counsel filed a notice of dismissal for the entire suit—all 1,300 clients. Ex. E.

Approximately three weeks later, Plaintiffs filed this nearly identical lawsuit in the Eastern District of Texas. The lawsuit contains most of the same 1,300 plaintiffs as in the First Federal Action. *Compare* ECF no 1 at ¶¶1-1363, *with* Ex. A at ¶¶1-1318. The Eastern District of Texas *sua sponte* transferred the case back to the Southern District of Texas, and it was assigned to this Court. Ex. F. Plaintiffs then waited 90 days to serve the Governor and have failed to serve *any* of the other named defendants—with the deadline for doing so having now lapsed.[12]

## V.   STATEMENT OF THE ISSUES

1.   Whether Plaintiffs have Article III standing to bring their claims against Governor Abbott.

2.   Whether Governor Abbott is entitled to sovereign immunity from Plaintiffs' claims.

3.   Whether Plaintiffs have stated a claim for an equal protection violation.

4.   Whether Plaintiffs have stated a claim for a First Amendment violation.

5.   Whether Plaintiffs have stated a claim for due process violation.

6.   Whether Plaintiffs have stated a claim for a Fourth Amendment violation.

## VI.   MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A.   Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a federal court to dismiss a claim for

---

[12] Dismissal of all claims against those unserved defendants is proper. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."); *see also* ECF No. 5 at ¶3 (informing Plaintiffs that "[t]he failure of plaintiff(s) to file proof of service within 90 days after the filing of the complaint may result in dismissal of this action by the court on its own initiative," thereby satisfying Rule 4(m)'s notice requirements).

lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). The party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "[T]here is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) (citation omitted). Under Rule 12(b)(1), the Court may consider any of the following: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997).

**B.    Plaintiffs lack standing to sue the Governor.**

Standing is an indispensable element of federal court jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must show: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action (causation) and that is (3) redressable by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). All three requirements are "an indispensable part of the plaintiff's case," and the party seeking to invoke federal jurisdiction bears the burden to establish them. *Lujan*, 504 U.S. at 561. Here, Plaintiffs fail to establish any of these three requirements.

**1.    Plaintiffs' alleged harm does not establish an injury-in-fact.**

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal quotation marks omitted). "'[S]tanding is not dispensed in gross'; a party must have standing to challenge each 'particular inadequacy in government administration.'" *Legacy Cmty. Health Servs., Inc. v. Smith,* 881 F.3d 358, 366 (5th Cir. 2018) (quoting *Lewis v. Casey,* 518 U.S. 343, 357-58 & n. 6 (1996)); *see also* U.S. Const. art. III, § 2, cl. 1.

Plaintiffs offer no facts describing how each of the 1,300 named individuals suffered any concrete and particularized injury-in-fact, much less one that is based on an action taken by the Governor. Indeed, the *only* facts pleaded about nearly all Plaintiffs is their county of residence, their occupation, and their status as "a Texas resident." ECF No. 1 at ¶¶1–1363. Although the complaint offers some additional facts about just two Plaintiffs, they still cannot satisfy the injury-in-fact requirement for even those individuals. Plaintiff James Daggett alleges that in May 2020 he was approached by local health officials, but he does not offer any facts to further describe the alleged injury he suffered. *Id.* at ¶¶1425–26.  Plaintiff Gabriella Ellison alleges that she was arrested in May 2020 for opening her bar in violation of GA-18, but her alleged past injury associated with a now-expired executive order has little relevance to the claims at issue in this case. *Id.* at ¶1464. This is the sum total of the Plaintiffs' standing allegations, which come nowhere close to meeting the Fifth Circuit's requirement that "plaintiffs must establish standing *for each and every provision they challenge.*" *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (collecting cases) (emphasis added). Even assuming that the allegations regarding Plaintiffs Daggett and Ellison were sufficient to establish actual injuries—which they are not—Plaintiffs certainly cannot take those two discrete injuries and then bootstrap them to complain about everything else in their complaint. *See id.* (citing *Lewis*, 518 U.S. at 358).

Furthermore, because Plaintiffs seek equitable relief, they must also show that "there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Merely having suffered an injury in the past is not enough; the plaintiff must show a "real or immediate threat that the plaintiff will be wronged again." *Id*. at 111. Plaintiffs' allegations regarding Daggett and Ellison do not establish a significant likelihood that they will encounter the same situation in the future, under similar circumstances, with a likelihood the same complained-of harm will recur. *See Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (finding that the voters' injury was not continuing or a threatened future injury that could satisfy the injury-in-fact requirement for Article III standing to seek injunctive relief); *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (noting that the plaintiff "has alleged only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future"). Accordingly, Plaintiffs have not alleged any facts to demonstrate they have suffered an injury-in-fact, which alone means they cannot establish standing to bring this suit.

2. **Plaintiffs cannot meet the traceability and redressability requirements for standing because the Governor does not enforce the challenged executive orders and the contact tracing protocols.**

 To establish standing to challenge a governmental action, a plaintiff must sue the party responsible for enforcing that action. *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). A plaintiff's failure to do so prevents the plaintiff from meeting the traceability and redressability requirements for standing. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020) ("Because the plaintiffs have pointed to nothing that outlines a relevant enforcement role for Governor Abbott, the plaintiff['s] injuries likely cannot be fairly traced to him."); *6th Street Bus. Partners LLC v. Abbott*, 2020 WL 4274589, at *4 (W.D. Tex. July 24, 2020)

("Plaintiffs cannot establish that [Abbott] caused their enforcement-based injury or that enjoining certain activities by Abbott would redress their injury. Accordingly, Plaintiffs have not met their burden to establish . . . standing to litigate their claims against Abbott . . . .").

Plaintiffs cannot establish standing to challenge any of the Governor's executive orders because the Governor has no enforcement role over those orders. Multiple courts, including the Fifth Circuit and the Texas Supreme Court, have already determined that a plaintiff lacks standing to sue the Governor over his executive orders precisely because he is not in charge of enforcing those orders. *See, e.g.*, *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (Plaintiffs lacked standing to sue the Governor over GA-09 because Texas law "empowers the Governor to 'issue,' 'amend,' or 'rescind' executive orders, not to 'enforce' them.") (quoting TEX. GOV'T CODE § 418.012)); *6th Street Bus. Partners LLC*, 2020 WL 4274589 at *4 (holding that the plaintiffs lacked standing because "Texas law does not explicitly grant Abbott the power to enforce compliance with GA-28"); *Mi Familia Vota v. Abbott*, No. 20-50793, 2020 WL 6058290, at *5 (5th Cir. Oct. 14, 2020) (finding that local authorities, rather than the Governor, had authority to enforce the executive order governing the masking requirements in polling locations during the COVID-19 pandemic); *In re Abbott*, 601 S.W.3d. 802, 812 (Tex. 2020) (holding that GA-13's enforcement did not come from the Governor or the Attorney General and therefore the plaintiffs lacked standing to bring claims against them). These decisions squarely foreclose Plaintiffs' constitutional challenges against the Governor over executive orders.

Likewise, Plaintiffs cannot demonstrate standing to sue the Governor and complain about the challenged DSHS contract or contact tracing protocols because he has no relevant enforcement authority. The Governor is unquestionably not a party to the contract that allegedly relates to the

contact tracing protocols.[13] And Plaintiffs plead no facts to demonstrate that the Governor has any role in implementing the contact tracing protocols. To the contrary, Plaintiffs' allegations appear to complain about actions taken by local health authorities who are not parties this lawsuit. *See* ECF No. 1 at ¶¶1416–26.

Under settled precedent, because Plaintiffs point to nothing suggesting that the Governor has a relevant enforcement role for any of their claims, they cannot establish that their injuries are fairly traceable to him or that their requested relief against him would redress their injuries. Plaintiffs cannot establish standing against the Governor on any of their claims.

### 3.   Plaintiffs also lack standing to bring their challenges to the Governor's executive orders because the challenged orders were already superseded.

Yet another reason that Plaintiffs lack standing as to the Governor's executive orders is that Plaintiffs strangely sued to complain about executive orders that, *at the time Plaintiffs sued,* were already superseded by subsequent executive orders. Plaintiffs filed their lawsuit on August 11, 2020. ECF No. 1. At that time, GA-30 was in effect as the most recent in the series of executive orders containing proportional and flexible restrictions to counter the spread of COVID-19.[14] But Plaintiffs' lawsuit mentions only executive orders GA-08, GA-16, GA-18, GA-21, GA-22, GA-23, and GA-26. *See* ECF No. 1 at ¶¶1382–89, 1392–1403. Each of these executive orders had already been superseded, with the latest order mentioned in the Complaint (GA-26) having been superseded by GA-28 on June 26, roughly a month and a half before Plaintiffs filed suit.[15]

---

[13] *Supra* at 13 n.9 (the MTX Contract itself).

[14] https://tinyurl.com/EO-GA-30 (GA-30).

[15] GA-08 was superseded by GA-14 on March 31 (https://tinyurl.com/EO-GA-14, p. 3); GA-14 was superseded by GA-16 on April 17 (https://tinyurl.com/EO-GA-16, p. 4); GA-16 was superseded by GA-18 on April 27 (https://tinyurl.com/EO-GA-18, p. 5); GA-18 was superseded by GA-21 on May 5 (https://tinyurl.com/EO-GA-21, p. 6); GA-21 was superseded by GA-23 on May 18 (https://tinyurl.com/EO-GA-23, p. 8); GA-23 was superseded by GA-26 on June 3

Even assuming Plaintiffs have experienced an injury (which they have not), there is no causal connection between Plaintiffs' supposedly "live" injury and these defunct executive orders. Nor can the Court enjoin their operation, raising redressability problems. Because Plaintiffs' lawsuit challenges executive orders that were superseded before they filed their lawsuit in August, they lack standing to challenge those executive orders. *See Stringer*, 942 F.3d at 720 ("Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury"); *cf. Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (noting that "a case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed").[16] While a case is rendered moot where a party challenges an order and that order is subsequently superseded, here, Plaintiffs' defect in their pleading should be viewed through the lens of standing, not mootness. *See*, *e.g.*, *Pluet v. Frasier*, 355 F.3d 381, 385–86 (5th Cir. 2004) (noting that standing is determined at time the initial complaint is filed); *Stringer*, 942 F.3d at 724 (distinguishing between standing and mootness and noting that "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum").

---

(https://tinyurl.com/EO-GA-26, p. 4); and GA-26 was superseded by GA-28 on June 26 (https://tinyurl.com/EO-GA-28, p. 4). Subsequent to this suit being filed, GA-28 was superseded by GA-30 on September 17 (https://tinyurl.com/EO-GA-30, p. 5), and GA-30 was superseded by GA-32 on October 7 (https://tinyurl.com/EO-GA-32, p. 5).

[16] *Cf. Martinko v. Whitmer*, 465 F. Supp. 3d 774, 777 (E.D. Mich. June 5, 2020) (holding that a claim challenging superseded COVID-19 restrictions was moot); *Ministries v. Newsom*, 465 F. Supp. 3d 1068, 1072 (S.D. Cal. June 4, 2020) (same); *Cameron v. Beshear*, 2020 WL 2573463, at *2–3 (E.D. Ky. May 21, 2020) (same); *Krach v. Holcomb*, 2020 WL 2197855, at *2 (N.D. Ind. May 6, 2020) (same).

Because Plaintiffs seek to challenge executive orders that are no longer in effect and have not demonstrated that a live executive order is imposing any injury, they lack standing to obtain the injunctive or declaratory relief sought.

## C.     Sovereign immunity bars Plaintiffs' claims against the Governor in their entirety.

Even if Plaintiffs had standing to bring their claims against the Governor, the Court should dismiss this suit for lack of subject-matter jurisdiction because Plaintiffs' claims are barred by sovereign immunity. An official-capacity suit against a state officer is a suit against the state, and the official is entitled to the state's sovereign immunity absent a clearly stated waiver or consent to suit by the State of Texas or valid abrogation by Congress.[17] *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Sovereign immunity squarely applies to the official-capacity claims brought here against the Governor. Plaintiffs may seek to avoid sovereign immunity by invoking the *Ex parte Young* doctrine, which provides a limited exception for claims seeking prospective injunctive relief, 209 U.S. 123 (1983), but that limited exception does not apply here.

Under the *Ex parte Young* exception, sovereign immunity may be overcome when the suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). "In conducting [the] *Ex parte Young* analysis, [the court] first consider[s] whether the plaintiff has

---

[17] While the Supreme Court has "sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity' . . . [as] convenient shorthand," the phrase is "something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). For the sake of consistency and accuracy, this brief will utilize the phrase sovereign immunity and will internally alter quoted material to follow this convention.

named the proper defendant or defendants." *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019). When challenging the constitutionality of a state statute, to fall within the *Ex parte Young* exception, the defendant must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 416). "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. This is because when the defendant has an insufficient connection to the enforcement of the law being challenged—including executive orders—"the suit is effectively against the state itself and thus barred by . . . sovereign immunity." *In re Abbott*, 956 F.3d at 708.

The Governor's lack of any enforcement role for the challenged executive orders, contract, or contact tracing protocols precludes application of *Ex parte Young*. The Fifth Circuit recently held that "statutory authority under Texas Government Code 418.012" authorizing executive orders during a declared disaster is insufficient to bring a challenge within the *Ex parte Young* exception. *In re Abbott*, 956 F.3d at 709. Thus, "the Governor lacks the required enforcement connection to [such executive orders] and may not be sued for injunctive relief under the Eleventh Amendment." *Id.*; *see also 6th Street Business Partners v. Abbott*, No. 20-CV-706-RP 2020 WL 4274589, at *3–4 (W.D. Tex. Jul. 24, 2020) (slip copy) (same). Likewise, because Plaintiffs do not (and cannot) claim that the Governor enforces the complained-of contract or contact tracing protocols, the Governor is immune to those claims as well. *In re Abbott*, 956 F.3d at 709 (holding that the Governor retains immunity where administrative penalties are "enforced by health and law enforcement officials and not the Governor").

Additionally, to the extent the Plaintiffs seek injunctive relief related to expired executive orders, such relief is improper. The *Ex parte Young* doctrine does not permit declarations regarding past conduct. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[T]he [*Young*] exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past."). Plaintiffs cannot obtain *prospective* relief as to executive orders that have already been superseded, so they are left seeking retrospective relief. Even if such relief could have some future effect by clarifying the contours of the law and deterring similar actions by an official, it is settled that "compensatory and deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Because the actions challenged by Plaintiffs all relate to alleged past harms, their claims against the Governor are barred by sovereign immunity.

\* \* \*

Plaintiffs lack standing to pursue any of their claims against the Governor, and each of the claims is barred by sovereign immunity. The Court should dismiss for lack of jurisdiction.

## VII.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A.   Federal Rule of Civil Procedure 12(b)(6).

Even if Plaintiffs could somehow establish jurisdiction (which they cannot), all of their claims should be dismissed for failure to state a claim. Plaintiffs make conclusory allegations, unsupported by facts, that would fail to state a claim against any state actor, but certainly do not assert any viable basis for holding *the Governor* liable for any conduct.

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss all or part of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive

a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff,'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)), a plaintiff must plead specific facts and cannot rely merely on "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Rule 12(b)(6), the Court may consider (1) the complaint; (2) the complaint's attachments; (3) a defendant's attachments that were referenced in the complaint and central to the plaintiff's claim; and (4) matters on which a court may take judicial notice. *See*, *e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris*, 500 F.3d at 461 n.9.

## B.   Plaintiffs' equal protection claim fails.

Plaintiffs have not alleged facts that create the reasonable inference that the Governor violated the Equal Protection Clause. "In areas of social and economic policy" such as this one, a "classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508

U.S. 307, 313 (1993). "Rational basis review begins with a strong presumption of constitutional validity." *Malagon de Fuentes v. Gonazalez*, 462 F.3d 498, 504 (5th Cir. 2006). "When applying rational basis doctrine to a dismissal for failure to state a claim, a . . . classification must be treated as valid 'if a court is able to hypothesize a legitimate purpose to support the action.'" *Glass v. Paxton*, 900 F.3d 233, 245 (5th Cir. 2018) (quoting *Mahone v. Addicks Util. Dist. of Harris Cty.*, 836 F.2d 921, 934 (5th Cir. 1988)).

"[W]hen conceiving of hypothetical rationales for a [government action], the assumptions underlying those rationales may be erroneous so long as they are 'arguable.'" *Id.* at 246. Under rational basis review, "[t]he fit between Texas's aims and the method used to obtain those aims need not be precise." *Harris v. Hahn*, 827 F.3d 359, 369 (5th Cir. 2016). "[E]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the State] imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'" *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 108 (1979)). Because Plaintiffs do not allege, and cannot establish, a suspect classification or the infringement of any constitutional right, the deferential rational basis test applies and provides wide discretion to address social or economic policy.

That discretion is even greater here given the severity of the current pandemic. For over a century, the Supreme Court has recognized that the authority to respond to public health crises must be "lodged somewhere," and it is "not an unusual, nor an unreasonable or arbitrary, requirement," to vest it in officials "appointed, presumably, because of their fitness to determine such questions." *Jacobson v. Massachusetts*, 197 U.S. at 27. As the Fifth Circuit has recognized in vacating a temporary restraining order that enjoined enforcement of an executive order issued by

26

the Governor, "the current global pandemic has caused a serious, widespread, rapidly-escalating public health crisis in Texas." *In re Abbott*, 954 F.3d at 795. The State's "interest in protecting public health during such a time is at its zenith." *Id.* The public health crisis in Texas has continued since the Fifth Circuit wrote those words on April 7, 2020.

Consistent with the assessment of epidemiologists and medical professionals, the safety measures challenged here in the now-superseded executive orders are rationally related to the effort to "flatten the curve" and prevent the spread of new COVID-19 cases. Plaintiffs' Complaint does not articulate how all 1,300 named plaintiffs suffer an equal protection violation; instead, it generally complains about occupancy limitations placed on certain businesses and that some business are exempt from those limitations while others are not. ECF No. 1 at ¶1457. But occupancy limitations are rationally related to preventing individuals from gathering in close proximity and increasing the likelihood of spreading COVID-19. Plaintiffs do not support their equal protection claim by identifying any of the businesses exempt from the occupancy limitations that should not be exempt or by pointing to any non-exempt business they claim should be exempt. It is not irrational, for example, for the executive orders to treat critical infrastructure and local government operations differently from entertainment services. And there are numerous practical reasons why certain establishments, like bars, may rationally be treated differently due to the risk that COVID-19 may spread more easily in that setting. "Shaping the precise contours of public health measures entails some difficult line-drawing. Our Constitution wisely leaves that task to officials directly accountable to the people." *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (rejecting equal protection challenge to an executive order closing some business and not others to prevent the spread of COVID-19).

Courts from across the country have repeatedly upheld the rationality of state officials' actions to combat COVID-19. *See, e.g.*, *Village of Orland Park v. Pritzker*, No. 20-CV-03528, 2020 WL 4430577 (N.D. Ill. Aug. 1, 2020); *Tigges v. Northam*, No. 3:20-CV-410, 2020 WL 4197610 (E.D. Va. July 21, 2020); *League of Indep. Fitness Facilities & Trainers, Inc.*, 814 F. App'x at 129; *Henry v. DeSantis*, No. 20-CV-80729, 2020 WL 2479447 (S.D. Fla. May 14, 2020); *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207 (E.D.N.C. June 8, 2020); *SH3 Health Consulting, LLC v. Page*, No. 4:20-CV-00605 SRC, 2020 WL 2308444 (E.D. Mo. May 8, 2020); *Amato v. Elicker*, No. 3:20-CV-464 (MPS), 2020 WL 2542788 (D. Conn. May 19, 2020); *McCarthy v. Cuomo*, No. 20-CV-2124 (ARR), 2020 WL 3286530 (E.D.N.Y. June 18, 2020); *Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908 (D. Ariz. July 14, 2020); *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020). Plaintiffs fail to state a claim for an equal protection violation.

## C.     Plaintiffs' First Amendment freedom of association claim fails.

Plaintiffs cannot state a viable claim for a violation of Plaintiff's freedom of association based on the only theory alleged: that contact tracing allegedly has an unconstitutional "chilling effect" on Plaintiffs' First Amendment associative rights. This claim is misdirected against the Governor, since he plays no role in contact tracing, but it is also utterly without merit because contact tracing procedures do not interfere with intimate or expressive association protected by the Constitution.

Plaintiffs' claims hinge on the idea that "contact tracing"—a crucial, recognized practice in mitigating the spread of communicable diseases like COVID-19—is unconstitutional because "depending on with whom Plaintiffs associate, Defendants may subject Plaintiffs to unwanted

surveillance by the State of Texas." EFC No. 1 at ¶ 1431. Further describing this claim, Plaintiffs explain that their "personal First Amendment associative activities are chilled by this tracking by Defendants of the people who associate with Plaintiffs, as Defendants seek reports from Texans on the movements and whereabouts of residents." ECF No. 1 at ¶ 1433.

Plaintiffs have failed to allege a viable claim under the First Amendment because they do not allege any interference with a type of association protected by the Constitution. There are two types of assembly and association protected by the Constitution. *See City of Dallas v. Stanglin*, 490 U.S. 19, 23–24 (1989). In one line of decisions are those cases implicating "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Id*. (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984)). Such relationships include marriage or child rearing. *Id*. In the second line of decisions is the "right to associate for the purpose of engaging in those activities protected by the First Amendment— speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id*. (quoting *Roberts*, 468 U.S. at 618). Plaintiffs' claims fall into neither category of protected association. Instead, Plaintiffs appear to claim a constitutionally protected right to associate for social purposes or for no purpose whatsoever. Their claim finds no basis in the Constitution.

The U.S. Supreme Court's opinion in *City of Dallas* effectively forecloses Plaintiffs' freedom of assembly and association claims. In that case, a "teenage" dance hall challenged a city ordinance restricting admission into certain dance halls to persons between the ages of 14 and 18. *City of Dallas*, 490 U.S. at 20–21. In rejecting the challenger's argument under the first line of association cases, the Court held that "[i]t is beyond cavil that dance-hall patrons . . . are not engaged in the sort of 'intimate human relationships' referred to in *Roberts*" (such as marriage or

raising children). *Id.* In rejecting the challenger's argument under the second line of association cases, the Court acknowledged that the ordinance restricted the ability of minors to associate with adults and vice versa, implicating opportunities that "might be described as 'associational' in common parlance," but went on to hold that merely being "patrons of the same business establishment," even patrons who visited for a social purpose, did not implicate a constitutional right to association. *Id.* at 25. The Court found that—even where the ordinance at issue explicitly restricted association—"social association" such as recreational dancing is not a right recognized by the Constitution. *Id.* Crucially, the Court explained that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.*

Just as a teenager's visit to the dance hall in *City of Dallas* was not expressive association, any visit by Plaintiffs to a bar, restaurant, or other business is not protected by Plaintiffs' expressive associational rights. The status of being "patrons of the same business establishment" is not protected under the Constitution. *Id.* Further, the fact that Plaintiffs do not even allege facts specific to any particular instance of association demonstrates Plaintiffs' failure to plead a viable claim. For example, "[t]here is no suggestion that these [Plaintiffs] 'take positions on public questions' " or engage in any other form of constitutionally protected speech as part of any claimed associational right. *See id.*

Further, Plaintiffs' theory that the challenged contact tracing protocols restrict activity amounts to nothing more than attenuated speculation. The challenged contact tracing protocols do not regulate, proscribe, forbid, or compel conduct. Rather, they facilitate the collection of voluntarily disclosed information to the contact tracing program *about* conduct in order to mitigate

the spread of a highly infectious disease.[18] Thus, even if Plaintiffs were engaged in protective associative activities (they are not), they fail to plead facts to establish a chilling effect on those activities. A First Amendment "chilling effect" claim cannot arise "merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Plaintiffs have failed to plead any facts that lead to the reasonable inference that Plaintiffs' First Amendment rights were violated.

## D.     Plaintiffs' due process claim fails.

Plaintiffs complain that "[u]nder Governor Abbott's Executive Orders, and in his contact tracing contract, Plaintiffs and their businesses are assumed to be virus incubators despite lack of evidence demonstrating so and without providing businesses due process to contest that assumption." ECF No. 1 at ¶1437. They also allege that "the criminal penalties associated with the COVID-19 executive orders violate the due process clause of the Fourteenth Amendment." *Id.* at ¶1440. Even apart from the fact that these allegations are misdirected against the Governor, Plaintiffs fail to assert a viable due process claim for several reasons.

First, while it is not clear whether Plaintiffs intend to assert a substantive due process claim, they have alleged no facts that would support such a claim because they identify no fundamental liberty interest at issue. Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Substantive due process applies only to the

---

[18] *See supra* at 14 n.10 (the Texas Health and Human Services Contact Tracing FAQ).

infringement of a fundamental liberty interest that is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). No such liberty interest is implicated by the challenged safety measures here.

Nor do Plaintiffs assert a valid procedural due process claim. In essence, Plaintiffs complain that the challenged health measures place restrictions on people and public places without first having concrete evidence that COVID-19—an invisible virus—is physically present. There are obvious problems with Plaintiffs' apparent policy preference against using prophylactic measures to mitigate a viral contagion. In any event, procedural due process does not provide a vehicle for Plaintiffs to dispute public health policy and the Supreme Court has recognized that procedural due process does not constrain the creation of generally applicable laws. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption"). "Government makes so many policy decisions affecting so many people that it would likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard." *Minn. State Bd. for Cmty. Coll. v. Knight*, 465 U.S. 271, 283 (1984); *Nolan v. Ramsey*, 597 F.2d 577, 580 (5th Cir. 1979) (holding that due process rights did not attach to the adoption of a rule by the Texas Railroad Commission because it was a quasi-legislative decision). And Plaintiffs do not explain how criminal penalties violate due process when any criminal proceedings to enforce those penalties would provide exactly that. Plaintiffs fail to plead a viable due process claim.

**E.    Plaintiffs' Fourth Amendment claim fails.**

Plaintiffs claim that the alleged contact tracing policy—which the Governor is not involved

in implementing—also "infringes on the Fourth Amendment rights of Plaintiffs and all Texans." ECF No. 1 at ¶ 1447. Plaintiffs go on to explain that "[t]here is no compelling justification for Defendants to track the daily movements of Plaintiffs and other Texans, of whom only a trivial number will have COVID-19." ECF No. 1 at ¶ 1448. Setting aside Plaintiffs' characterization of the serious risks and challenges posed by COVID-19 as "trivial," their Fourth Amendment claim is baseless because contact tracing does not involve a search or seizure as contemplated by the Fourth Amendment.

As an initial matter, Plaintiffs plead no facts to show that they have been subject to search or seizure. Contact tracing involves the mere gathering of information, and thus cannot be construed as a seizure. And Plaintiffs cannot plead a valid "search" claim by alleging that "all Texans" *could* conceivably in the future have information about them disclosed because voluntary disclosure of information by a third-party is not a search of one's person. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("The Amendment protects persons against unreasonable searches of their persons and houses and thus indicates that the Fourth Amendment is a personal right that must be invoked by an individual.").

Critically, Plaintiffs do not (and cannot) claim an expectation of privacy in information disclosed by third parties as part of contact tracing. The Supreme Court "uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). This inquiry normally embraces two discrete questions. *Id.* "The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,'—whether, in the words of the *Katz*

majority, the individual has shown that 'he seeks to preserve something as private.'" *Id.* (internal citations omitted). "The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable,'—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Id.* (internal citations omitted).

Under this standard, Plaintiffs' claim does not create a reasonable inference of a Fourth Amendment violation because they cannot satisfy either prong. First, Plaintiffs have failed to plead even a subjective expectation of privacy in their day-to-day activities when visiting the type of *public* places—such as grocery stores and restaurants—that contact tracing monitors to avoid COVID-19 spread. Having failed to plead facts leading to the reasonable inference that any of the Plaintiffs had a subjective expectation of privacy, this Court should dismiss this claim.

But even if Plaintiffs had pleaded a subjective expectation of privacy, it is not a reasonable expectation and thus fails the second prong of the "search" test. Public spaces like grocery stores and restaurants, where contact tracing is key to mitigate the spread of COVID-19, are the most obvious places people have no reasonable expectation of privacy. The fact that others are in Plaintiffs' presence in these public places itself belies any claim that there exists a reasonable expectation of privacy, even where the other parties voluntarily disclose the information to those conducting contact tracing.

The Supreme Court has been clear that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). Yet contact tracing is exclusively dedicated to determining when and where COVID-19 may have been "expose[d] to the public." Thus, it seeks precisely the

information that *Ciraolo* confirms is not constitutionally protected. Even if Plaintiffs *did* have a subjective expectation of privacy when visiting grocery stores and restaurants, that expectation is patently unreasonable and fails to satisfy the standard for a "search" under the Fourth Amendment.

Plaintiffs have failed to plead facts demonstrating that a search or seizure has occurred in the Fourth Amendment context. This claim should be dismissed under Fed. R. Civ. Proc. 12(b)(6).

## VIII.   CONCLUSION

Defendant Governor Abbott respectfully requests that the Court grant his motion and dismiss all claims against him pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendant further seeks all other relief to which he may be justly entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief – General Litigation Division

*/s/ Matthew Bohuslav*
MATTHEW BOHUSLAV
Assistant Attorney General
Texas Bar No. 24069395
Southern Dist. No. 1303218
matthew.bohuslav@oag.texas.gov

BENJAMIN L. DOWER
Assistant Attorney General

Texas Bar No. 24082931
Southern Dist. No. 1742612
benjamin.dower@oag.texas.gov

Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667

***Attorneys for Defendant Governor Abbott***

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which automatically provided notice to all counsel of record.

*/s/ Matthew Bohuslav*
MATTHEW BOHUSLAV
Assistant Attorney General